# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

| | |
|---|---|
| Albert Robertson and Frances Robertson, William J. Garrity, III and Garrity Ventures, LLC, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> Sea Pines Real Estate Companies, Inc. a/k/a The Sea Pines Real Estate Co.; Coastal Homes and Land, Inc. a/k/a Coastal Homes & Land Realty; Collins Group Realty, Inc.; Engard Rental Company, LLC a/k/a Engard Real Estate Co.; Bruce A. Goff, Inc; Daufuskie Island Resort Realty, LLC; Searchlight Realty, Inc. a/k/a Searchlight Realty; Gateway Realty, LLC; Hilton Head Luxury Properties, Inc. a/k/a Prudential Premier Island Properties; Charter 1 Realty & Marketing; The William F. Hilton Company a/k/a William F. Hilton Realty; E.G. Robinson, III and Associates Realtors, Inc. a/k/a E.G. Robinson Real Estate; Gina Scott Realty; Lancaster Resort Rentals and Sales, Inc. a/k/a Lancaster Resort Sales; Ingram, Thompson & Assoc., Inc.; Julie Toon Pawley Real Estate Broker, Inc.; and CRG Properties, Inc. a/k/a Carolina Realty Group, Inc. <br><br> Defendants. | Case No. 9:10-95-SB <br><br><br> **COMPLAINT** <br> (Jury Trial Demanded) |

## INTRODUCTION

Albert Robertson and Frances Robertson, William Garrity and Garrity Ventures, LLC, on

behalf of themselves and other purchasers of real-estate-brokerage services listed by defendants on

the Multiple Listing Service of Hilton Head Island, Inc. ("MLS") bring this action to obtain relief

for defendants' violation of the Sherman Act. Defendants unlawfully restrained competition among real-estate brokerages in Hilton Head Island, South Carolina and the surrounding counties and areas that comprise the Hilton Head MLS ("MLS Service Area") by enacting and enforcing unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and the other class members to pay higher prices for real-estate-brokerage services (i.e., real-estate-brokerage commissions and any other fees charged) than they would have paid absent defendants' unlawful conduct.

## PARTIES

1.      Plaintiff Albert Robertson is a citizen of South Carolina, residing in Beaufort County. During the class period, Mr. Robertson purchased real-estate-brokerage services from Defendant Sea Pines Real Estate Companies, Inc a/k/a The Sea Pines Real Estate Co. and paid more for these services than he would have paid had Defendant Sea Pines Real Estate Companies, Inc a/k/a The Sea Pines Real Estate Co. and the other defendants not unlawfully restrained competition in the MLS Service Area by developing, implementing, and facilitating the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused him and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

2.      Plaintiff Frances Robertson is a citizen of South Carolina, residing in Beaufort County. During the class period, Mrs. Robertson purchased real-estate-brokerage services from Defendant Sea Pines Real Estate Companies, Inc a/k/a The Sea Pines Real Estate Co. and paid more for these services than she would have paid had Defendant Sea Pines Real Estate Companies, Inc a/k/a The Sea Pines Real Estate Co, and the other defendants not unlawfully restrained competition in the MLS Service Area by developing, implementing, and facilitating the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused her and other class members

to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

3.      Plaintiff William Garrity is a citizen of South Carolina, residing in Beaufort County. Garrity Ventures, LLC is a South Carolina limited liability company organized pursuant to the laws of South Carolina with its principal place of business in Beaufort County. Collectively, these entities shall be referred to as "Garrity". Garrity purchased real-estate-brokerage services from Defendant Collins Group Realty, Inc. and paid more for these services than he would have paid had Defendant Collins Group Realty, Inc. and the other defendants not unlawfully restrained competition in the MLS Service Area by developing, implementing, and facilitating the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused him and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

4.      Defendant Sea Pines Real Estate Companies, Inc. a/k/a The Sea Pines Real Estate Co. is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Sea Pines agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

5.      Defendant Coastal Homes and Land, Inc. a/k/a Coastal Homes & Land Realty is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Coastal Homes agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused

plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

6.     Defendant Collins Group Realty, Inc. is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Collins Group agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

7.     Defendant Engard Rental Company, LLC a/k/a Engard Real Estate Co. is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Engard agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

8.     Defendant Bruce A. Goff, Inc. is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Goff agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

9.     Defendant Daufuskie Island Resort Realty, LLC is a licensed real-estate brokerage doing business in the MLS Service Area.   While involved in and participating on (via its

employees) MLS's Board of Trustees during the class period, Daufuskie agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

10.     Defendant Searchlight Realty, Inc. a/k/a Searchlight Realty is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Searchlight agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

11.     Defendant Gateway Realty, LLC is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Gateway agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

12.     Defendant Hilton Head Luxury Properties, Inc. a/k/a Prudential Premier Island Properties is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Prudential agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that

caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

13.     Defendant Charter 1 Realty & Marketing is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Charter 1 agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

14.     Defendant The William F. Hilton Company a/k/a William F. Hilton Realty is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Hilton agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

15.     Defendant E.G. Robinson, III and Associates Realtors, Inc. a/k/a E.G. Robinson Real Estate is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Robinson agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

16.     Defendant Gina Scott Realty is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of

Trustees during the class period, Scott agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

17.    Defendant Lancaster Resort Rentals and Sales, Inc. a/k/a Lancaster Resort Sales is a licensed real-estate brokerage doing business in the MLS Service Area. While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Lancaster agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

18.    Defendant Ingram, Thompson & Assoc., Inc. is a licensed real-estate brokerage doing business in the MLS Service Area. While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Ingram agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

19.    Defendant Julie Toon Pawley Real Estate Broker, Inc. is a licensed real-estate brokerage doing business in the MLS Service Area. While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Pawley agreed with its co-defendant brokerages to enact and enforce unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

20.     Defendant CRG Properties, Inc. a/k/a Carolina Realty Group, Inc is a licensed real-estate brokerage doing business in the MLS Service Area.  While involved in and participating on (via its employees) MLS's Board of Trustees during the class period, Carolina Realty agreed with its co-defendant brokerages to develop, implement, enact, and facilitate the enforcement of unlawful MLS rules, regulations, by-laws, policies, and procedures that caused plaintiffs and other class members to pay higher prices for real-estate-brokerage services than they would have paid absent defendants' unlawful conduct.

## JURISDICTION AND VENUE

21.     Defendants' acts or omissions occurred in South Carolina.

22.     Because this matter arises under the Sherman Act, 15 U.S.C.S. § 1, *et seq.*, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

23.     This Court has personal jurisdiction over defendants because plaintiffs' and the class members' properties are located within this judicial district; plaintiffs' and the class members' causes of action accrued within this judicial district; and defendants do business within this judicial district.

24.     Venue is appropriate in this Court because all defendants' principal place of business is in the MLS Service Area, which encompasses this judicial district.

## FACTUAL ALLEGATIONS

**A.     Background on MLS**

25.     MLS is an entity to which all defendants and other brokerages belong and pay periodic dues.  In exchange for these dues, MLS provides defendants and other member brokerages access to an electronic database of supply, pricing, and property-characteristics information relating to past and current real-estate listings in the MLS Service Area.

26.     Although MLS also serves several surrounding counties as well as Hilton Head Island, close to 85% of MLS's listed properties—as measured by dollar volume of closed transactions—are located on Hilton Head Island, which is served by no other multi-listing service. MLS is thus a marketwide joint venture of supposed competitors that possesses substantial market power, and to compete successfully a brokerage must be an MLS member.

27.     MLS's database allows its members, including defendants, to communicate information among themselves, such as descriptions of listed properties for sale and offers to compensate other members if these other members locate buyers for the listing agent or broker. The MLS database also allows members representing buyers to search the listed properties to match buyers' needs.

28.     By providing an efficient means of exchanging information on real-estate listings, MLS is intended to benefit real-estate buyers and sellers and, in turn, buyers of real-estate-brokerage services in the MLS Service Area. And since virtually all for-sale properties in the MLS Service Area are listed on MLS, in order to appreciate availability; recognize property characteristics; and understand real-estate prices, buyers' agents must use MLS when assisting buyers in making a purchase decision.

29.     This role makes access to the MLS database—and therefore MLS membership—critically important for any brokerage seeking to serve clients efficiently in the MLS Service Area. Indeed, access to the MLS database is critical to being a successful MLS Service Area brokerage, as MLS is the only provider of this service in the MLS Service Area. Therefore, brokerages seeking to meaningfully provide real-estate-brokerage services in this area must be MLS members.

30.     Defendants—through their various employees' participation on MLS's Board of Trustees and by using MLS as a conduit—have created rules that govern MLS members' conduct and business practices and have set standards for admitting new members. Through these rules,

defendants have profited by illegally inhibiting competition over the method by which they provide real-estate-brokerage services to customers (i.e., property sellers) in the MLS Service Area and have illegally stabilized the prices that these customers pay for real-estate-brokerage services.

31.    For example, defendant-imposed MLS rules prevent members from providing a set of real-estate services that includes less than the full array of services that brokerages traditionally have provided—even if a customer prefers to save money by purchasing less than all the services a broker offers.  Additionally, defendant-imposed MLS rules require members to use a standard, pre-approved contract that, among other things, prevents its members from offering to a property seller the option of avoiding paying the broker a commission if the seller finds the buyer on his or her own.

32.    But perhaps most egregious—and certainly most germane to Plaintiffs' Complaint—defendant-imposed MLS rules enforce unreasonable and objective criteria for membership and contain subjective standards for admission to membership that *allow MLS representatives to deny membership to brokerages who they might expect to compete more aggressively or in more innovative ways than MLS members, including defendants, would prefer*.  Instead, MLS representatives *exclude* innovative brokerages or otherwise deter them from seeking MLS membership.

33.    Taken together, defendant-facilitated-and-imposed MLS rules limit competition among brokerages; artificially stabilize the price of real-estate-brokerage services; and deter innovation and the emergence of new brokerage business models.  By adopting and enforcing the foregoing MLS rules, defendants violated and continue to violate federal law.

**B.    Relevant market**

34.    The market for real-estate-brokerage services in the MLS Service Area constitutes the relevant market in this matter.

35.     Most real-estate sellers prefer to work with a broker or agent familiar with local market conditions.  For this reason, the real-estate-brokerage business is necessarily local in nature, and the relevant geographic markets in which brokerages compete are normally no larger than the service area of the multi-listing service in which the brokerages participate.

**C.     Concerted action by defendants**

36.     MLS is a combination or conspiracy among defendants whose various employees comprise MLS's Board of Trustees.  And while a multi-listing service, like other joint ventures with market power, can have reasonable membership restrictions related to a legitimate, pro-competitive purpose, it cannot create rules that unreasonably impede competition among brokerages and harm consumers.  *See United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1371 (5th Cir. 1980) ("[W]here a broker is excluded from a multiple listing service with the requisite market power without an adequate justification in the competitive needs of the service, both the broker and the public are clearly harmed.").

37.     Defendants agreed to adopt, maintain, and enforce rules affecting the way MLS members provide real-estate-brokerage services; participate in MLS; and gain access to MLS services, including critical access to the MLS database.  Accordingly, MLS rules are the result of agreements and concerted action among defendants to restrain competition and adversely affect plaintiffs and the class members.

**D.     Defendants' illegal conduct**

***1.     The real-estate industry and defendants' market power in the MLS Service Area***

38.     Most all real-estate sellers and buyers hire a brokerage, and brokerages in the MLS Service Area are supposed to compete with each other to provide real-estate-brokerage services to customers. In fact, according to a national survey by the National Association of Realtors, which had 7,800 respondents located through county deed records, 87% of all home sellers use a broker.

39.    MLS is the only multiple-listing service for the MLS Service Area, and, upon information and belief, brokerages generally believe it would amount to economic suicide for them to leave MLS.  Among other services, MLS provides its members the pooling and dissemination of information on virtually all properties available for sale in the MLS Service Area.

40.    MLS combines its members' real-estate-listings information into an electronic database and makes this data available to all MLS-member brokerages.

41.    By listing information about a property for sale with MLS, a brokerage can market the property efficiently to a large number of potential buyers.

42.    A brokerage representing a buyer likewise can search the MLS database to provide the buyer with information about virtually all properties for sale in the MLS Service Area.

43.    MLS-member brokerages use the database to, among other things, communicate to other MLS-member brokerages the listing information relating to real estate they have for sale; offer to compensate other member brokerages as cooperating brokerages if these cooperating brokerages locate buyers for the selling brokerages' listings; and locate real estate for prospective buyers.

44.    MLS also provides records of sold real estate that brokerages use when working with sellers to set a property's listing price and to decide what offers to accept.  Brokerages representing buyers likewise use sales data to help their customers.  Agents enlisted by property buyers to assist in purchasing a property often present options drawn exclusively from properties listed in the MLS, which listings describe supply to buyers' brokerages; appropriate properties for their buyer-clients; and allow buyers' agents to make appropriate offers.

45.    Not surprisingly, then, access to MLS is critical for brokerages who wish to serve buyers or sellers successfully in the MLS Service Area, and MLS members account for virtually all the real-estate-brokerage services provided to property buyers and sellers in the MLS Service Area.

Accordingly, MLS has market power in the market for real-estate-brokerage services in the MLS Service Area.

**2.    *The growth of alternative-brokerage models***

46.    The prices customers pay to brokerages for the real-estate-brokerage services associated with a typical real-estate sales transaction have increased substantially since 2003 in the MLS Service Area.  This is because brokerages who adhere to traditional methods of doing business (like the MLS-member brokerages) typically charge a fee calculated as a percentage of the property's sales price, and that percentage has tended to be relatively inflexible despite the fact that, on an historical average, property prices in the MLS Service Area have substantially increased.

47.    As a result of higher property prices in the MLS Service Area and elsewhere, innovative brokerages offering competitively significant alternatives to traditional methods emerged in the MLS Service Area.  *If defendants hadn't restricted these innovative brokerages* from *competing in the MLS Service Area, these brokerages would have provided MLS Service Area customers of real-estate-brokerage services with competitive options and, in the process, placed downward pressure on the prices charged by defendants, who offer traditional methods of providing real-estate-brokerage services.*

48.    But during the class period, defendants did *not* let these innovative brokerages compete in the MLS Service Area.  Instead, the MLS rules that defendants colluded to promulgate forbade these innovative brokerages from joining MLS and from gaining access to the MLS listings database.

49.    MLS membership to these innovative brokerages would have allowed them to compete effectively with defendants and the other real-estate-brokerages who were MLS members.

50.    But defendants instead unreasonably restricted competition in the MLS Service Area, thereby depriving options and competitive pricing to customers—like Plaintiffs—in favor of artificially high, anti-competitive prices.

**E.    Defendants' agreement to restrain competition**

51.    The MLS rules that defendants colluded to promulgate harmed competition in multiple ways.  As a result of these rules, customers of real-estate-brokerage services in the MLS Service Area had fewer choices among types of brokerages and paid higher fees for those services than customers in other areas of the country.

52.    The MLS rules that defendants colluded to promulgate were not reasonably necessary to achieve the pro-competitive benefits of the MLS.

53.    Instead, the MLS rules that defendants colluded to promulgate unreasonably (1) raised entry barriers for potential competitors by imposing burdensome prerequisites for membership; (2) provided a means of identifying potentially aggressive competitors so defendants could exclude them from MLS membership; (3) stabilized the price of real-estate-brokerage services through the prospect of price controls; (4) deterred the emergence of Internet-based brokerages; (5) stabilized the price of, and reduced customers options for, real-estate-brokerage services by dictating the services that all brokerages in the MLS Service Area had to provide; and (6) discouraged entry of potential competitors who raised funds through public ownership.

54.    The MLS rules that defendants colluded to promulgate achieved the foregoing adverse effects by requiring that brokerage-members:  (1) maintain a physical office within the MLS Service Area; (2) reside within the area served by the MLS; (3) operate their offices during hours deemed reasonable by the MLS; and (4) hold a South Carolina real-estate license as their primary license.  (Bylaw Article II, Section II; Bylaw Article VII; and Rule II)  These MLS rules

allowed defendants to deny membership to real-estate brokerages who operated business models that increased competition.

55.     For example, the MLS rules that defendants colluded to promulgate enabled defendants to exclude technology-savvy brokerages who served their clients without a physical office, which would have allowed these brokerages to pass along the cost savings to customers—like plaintiffs and the class members—through reduced commission rates.

56.     The MLS rules that defendants colluded to promulgate also deprived customers the benefits of competition from brokerages who worked part-time or who were licensed under South Carolina law's reciprocity provisions.

57.     The MLS rules that defendants colluded to promulgate enabled defendants to identify applicants who could be aggressive competitors and to deny their application for MLS membership.

58.     The MLS rules that defendants colluded to promulgate required brokerage-applicants to disclose their business history and prior employment, undergo a credit check, and obtain letters of recommendation from three current brokerage-members (i.e., those with whom the applicant would compete).  (Bylaw Article VII, Section IV; Bylaw Article VII, Section IV(a); Rule II.A.2.)

59.     The MLS rules that defendants colluded to promulgate required MLS members to provide certain services to all brokerage customers and barred members from operating a "fee-for-service" business model, whether or not desired by the customer, which rule decreased competition and harmed customers because it insulated defendants from the competitive pressures posed by brokerages that offered additional pricing and service choices to their customers.  (Bylaw Article X; MLS Listing Agreement.)

60.    Defendants also agreed to authorize the MLS Board of Trustees, which defendants controlled, to impose discriminatory requirements on Internet-based real-estate brokerages.  (Bylaw Article II, Section II.)

61.    The prospect that the MLS Board of Trustees might adopt such controls likely deterred MLS Service Area real-estate brokerages from developing Internet-based business models and inhibited and adversely impacted plaintiffs and the class members.

62.    Defendants further agreed to an MLS "change-in-ownership" rule that required publicly held brokerages to make a significant payment to the MLS every time a share of stock changed hands.  (Bylaw Article VII, Section X; Rules II.A.3; II.B and II.E.)

63.    This change-in-ownership rule competitively disadvantaged publicly owned companies and discouraged them from joining the MLS and from competing in the MLS Service Area, thereby limiting customer choice and adversely impacting plaintiffs and the class members.

64.    Notably, the "broker's commission" is the price that a seller pays for real-estate-brokerage services, and a large part of these commissions during the class period incorporated and reflected defendants' anti-competitive conduct, despite the fact that MLS rules did not prescribe or otherwise set broker's commission rates or levels.

65.    Had it not been for defendants' anticompetitive conduct, prices plaintiffs and the class members paid for real-estate-brokerage services would have been lower on account of low-priced and innovative real-estate brokerages' ability to compete in the MLS Service Area, which competition did not exist due to defendants' collusion to promulgate anti-competitive MLS rules.

66.    Taken together, the MLS rules discouraged competition on price and inhibited competitive actions that would have altered the status quo.  As a result of the MLS rules that defendants colluded to promulgate, customers of real-estate-brokerage services in the MLS Service Area—like plaintiffs and the class members—had fewer choices of service options and paid higher

prices for real-estate-brokerage services than did customers in other parts of the country and that these customers would have paid absent defendants' conspiracy and anticompetitive conduct.

**F.      The Department of Justice's recent federal lawsuit against MLS and resulting stipulation**

67.      On October 16, 2007, the U.S. Department of Justice filed a complaint (Exhibit A) for equitable relief against MLS for violation of § 1 of the Sherman Act, seeking to enjoin MLS from enforcing the aforementioned rules promulgated by defendants because these rules restrain competition among real-estate brokerages in the MLS Service Area to the detriment of defendants' customers, meaning plaintiffs and the class members.

68.      On September 17, 2007 (a month before the DOJ filed its complaint), MLS and the DOJ stipulated to entry of a proposed final judgment (Exhibit B), which was filed on October 18, 2007.  The proposed final judgment, among other things, required MLS to change the membership rules that defendants had colluded to promulgate so that low-priced and innovative real-estate brokerages could compete in the MLS Service Area, which rules, according to the DOJ's October 16, 2007 press release (Exhibit C), "*caused consumers to pay more for residential real estate brokerage services in the MLS Service Area*" (emphasis added).

69.      According to Thomas O. Barnett, then-Assistant Attorney General for the DOJ's Antitrust Division, the settlement "remove[d] impediments to competition for real-estate-brokerage services in the MLS Service Area, which *should lead to increased options and reduced brokerage fees for consumers*," (*Id.* emphasis added) and since "access to the MLS database—and therefore MLS membership—is critical for any real-estate broker seeking to serve clients successfully in the MLS's service area . . . the rules adopted by the MLS governing who can be a member and how members must behave [could] have a significant impact on competition among real estate brokers in the area served by the MLS." *Id.*

70.    The proposed final judgment enjoined and restrained MLS from adopting or enforcing any bylaw, rule, regulation, policy, or practice that had the purpose of effect of:

a.   Excluding from full membership any real-estate brokerage that had a broker-in-charge holding an active real-estate broker license issued by the appropriate South Carolina governmental licensing authority or any appraisal firm owned by or employing at least one person with an active appraiser license issued by the appropriate South Carolina governmental licensing authority;

b.   Excluding from associate membership any licensee who held an active real-estate broker, agent, or salesman license issued by the appropriate South Carolina governmental licensing authority;

c.   Failing to make available or furnish on like terms to any full MLS member any and all services that MLS then or thereafter made available or furnished to any of its full members;

d.   Failing to make available or furnish on like terms to any associate MLS member any and all services that MLS then or thereafter made available or furnishes to any of its associate members;

e.   Failing to make available or furnish on like terms to any member who was an appraiser any and all services that MLS then or thereafter made available or furnished to any of its members who are appraisers;

f.   Discriminating against, disfavoring, disciplining, or expelling any full or associate MLS member based on its office location, corporate structure, level or type of compensation, scope of service, or method of service;

g.   Requiring any full or associate MLS member to perform real-estate-brokerage services in excess of those required by South Carolina law;

h.   Prescribing the terms of listing agreements, buyer's-representation agreements, or any other agreement between a full or associate MLS member and any client or any other person who is a prospective buyer or seller;

i.   Refusing to accept or place in the MLS any MLS listing submitted by a full or associate MLS member;

j.   Prescribing, recommending, setting standards, or guidelines concerning compensation;

k.   Requiring an applicant or a full MLS member to inform MLS of the ownership interests that others have in such applicant or full MLS member or charging a fee for a change in ownership;

l.   Requiring any full or associate MLS member, appraiser, or trustee to reside or have an office in the MLS service area or any particular area or location; or

m. Changing MLS's three classes of membership (full, associate, and affiliate) without DOJ's prior approval.

71.    The proposed final judgment also required MLS to delete and suspend multiple bylaws and rules that defendants colluded to promulgate.

72.    Furthermore, the proposed final judgment contained compliance and inspection provisions, including the requirement that within 60 days after the date of entry of the final judgment, MLS had to:  (1) provide all of its members, trustees, and employees with notice of the amendments to its bylaws, rules, regulations, and policies to conform to the provisions of final judgment; (2) provide all of its members, trustees, and employees with a copy of the final judgment; (3) inform everyone that MLS knows to have inquired about membership in the last two years but who are not members of the amendments to MLS's bylaws, rules, regulations, and policies to conform to the provisions of the final judgment; (4) inform all people and companies in active concert with MLS that they may apply or reapply for membership and that MLS will grant membership if the applicant meets the requirements of the bylaws, rules, regulations, and policies as revised by the final judgment; and (5) place on MLS's home page of its publicly accessible web site (currently, www.hiltonheadmls.com) a notice of the final judgment with a link to the final judgment.

73.    DOJ's lawsuit against MLS sought and obtained solely injunctive relief.

**G.    Effect on South Carolina and interstate commerce**

74.    Defendants provide real-estate-brokerage services to customers seeking to buy or sell real estate in the MLS Service Area, and defendants' illegal activities affected customers purchasing real-estate services in the MLS Service Area.

75.    In 2005 alone, MLS-member real-estate brokerages—including defendants—facilitated the exchange of property worth over $2.5 billion and collected fees of approximately $170 million for their services.

76.    Defendants' activities were in the flow of and had a substantial effect on South Carolina and interstate commerce.

## CLASS-ACTION ALLEGATIONS

77.    Plaintiffs bring this lawsuit on behalf of the following class under Rule 23(b)(3) of the Federal Rules of Civil Procedure:

> All individuals or businesses that purchased defendants' real-estate brokerage services in the MLS Service Area from January 1, 2003 through September 17, 2007.

78.    Plaintiffs Robertson purchased real-estate-brokerage services from Sea Pines during the class period; therefore, they are class members.

79.    Plaintiffs Garrity purchased real-estate-brokerage services from Collins Group Realty during the class period; therefore, they are class members.

80.    Plaintiffs can identify all other class members from defendants' own records.

81.    Plaintiffs do not know the exact size of the class since this information is in defendants' exclusive control.  But based on the nature of the trade and commerce involved, Plaintiffs believe that the class numbers in the thousands and that the class members are dispersed throughout the MLS Service Area and beyond.  Therefore, joinder of all class members would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

82.    Plaintiffs' claims are typical of other class members' claims because they were injured through defendants' uniform misconduct and paid a supra-competitive price for real-estate-brokerage services when selling their property without knowing that their commissions were illegal

and improper.  Accordingly, by proving their own claims, Plaintiffs will necessarily prove the other class members' claims.

83.    Common legal and factual questions predominately exist within the class, including but not limited to the following:

> a. Whether defendants conspired to exclude innovative real-estate brokerages from participating in MLS and from gaining important access to the MLS database;
>
> b. The existence and duration of defendants' horizontal agreement to exclude innovative real-estate brokerages from participating in MLS and from gaining important access to the MLS database;
>
> c. Whether defendants implemented their conspiracy to exclude innovative real-estate brokerages from participating in MLS and from gaining important access to the MLS database;
>
> d. Whether defendants' conspiracy adversely affected class members by way of increasing the prices they paid for real-estate-brokerage services on account of innovative real-estate brokerages' inability to compete in the MLS Service Area market; and
>
> e. Whether defendants' conduct caused injury-in-fact to the business or property of plaintiffs and the class members, and if so, the appropriate classwide measure of damages;

84.    Plaintiffs can and will fairly and adequately represent and protect the class members' interests and have no interests that conflict with or are antagonistic to these class members' interests.  Moreover, Plaintiffs' attorneys are experienced and competent in complex, class-action and antitrust litigation.

85.    Class certification is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because:

> a. Common questions of law and fact overwhelmingly predominate over any individual questions that exist within the class and, consequently, enormous economies to the Court and parties exist in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;
>
> b. Each class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

    c.  Class treatment is required for optimal deterrence and compensation and for limiting the Court-awarded, reasonable legal expenses incurred by class members; and

    d.  Despite the relatively small size of each class member's claim, the aggregate volume of their claims, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable class counsel to litigate this case as a class action on a cost-effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

86.     Throughout the class period, defendants affirmatively and fraudulently concealed their illegal conduct.

87.     Defendants attributed the cost of their commissions to legitimate market forces with the intention of concealing the true nature of defendants' coordination.

88.     Defendants never told plaintiffs or other class members that they were fixing the prices of real-estate services.  Accordingly, plaintiffs and class members could not have even suspected the violations alleged herein at least until DOJ filed its complaint in October 2007— which did not even name defendants but only named MLS—because defendants conducted their conspiracy secretly; concealed the nature of their illegal conduct; and fraudulently concealed their activities through various other means and methods designed to avoid detection, such as (a) meeting secretly to discuss fixing the prices of real-estate services in the MLS Service Area during the class period; (b) using methods of communication in furtherance of the alleged conspiracy that were designed to avoid detection; (c) giving pretextual reasons for costs of real-estate services in the MLS Service Area during the class period; and (d) agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

89.    In both DOJ's complaint (Exhibit A at ¶22) and its Competitive Impact Statement (Exhibit D at p.4), DOJ suggests that defendants' conspiracy extended back to at least the beginning of 2003; although, nothing in these documents suggests that Plaintiffs—much less DOJ itself—through reasonable diligence could ever have suspected that defendants' conspiracy was the cause of Plaintiffs' real-estate services prices until such time as DOJ filed its complaint in October 2007.

90.    As a result of defendants' fraudulent concealment, the applicable statute of limitations affecting plaintiffs and the class members' claims has been tolled.  Plaintiffs and the class members did not discover, nor could have suspected through reasonable diligence, that defendants were violating the antitrust laws until DOJ filed its complaint in October 2007. Plaintiffs could not have suspected the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by defendants to avoid detection and affirmatively conceal their violations.

91.    Because defendants kept their contract, combination, or conspiracy secret, Plaintiffs were unaware of the fact that the prices of real-estate services in the MLS Service Area were secretly raised, fixed, maintained, or stabilized as alleged herein.

92.    As a result of defendants' fraudulent concealment, Plaintiffs assert the tolling of the statute of limitations affecting the cause of action alleged by them and the class members.

### COUNT
### (Violation of the Sherman Act, 15 U.S.C. § 1, *et. seq*)

93.    During the class period, defendants engaged in an illegal contract, combination, or conspiracy—with MLS and MLS's rules serving as their conduit—to restrain trade or commerce.

94.    In particular, defendants conspired to exclude innovative real-estate brokerages from participating in MLS and from gaining important access to the MLS database in violation of Section 1 of the Sherman Act, 15 U.S.C.S. § 1, *et seq.*

95.    Defendants' conspiracy allowed them to (a) fix, raise, maintain, and stabilize prices of real-estate-brokerage services charged to plaintiffs and the class members, and (b) caused plaintiffs and the class members to pay higher prices for real-estate-brokerage services for which they directly contracted with defendants than they would have paid absent defendants' conspiracy.

96.    In formulating and effectuating their conspiracy, defendants met to discuss excluding, and agreed to exclude, innovative real-estate brokerages from participating in MLS and from gaining important access to the MLS database, which agreement and exclusion allowed defendants to charge plaintiffs and the class members supra-competitive prices for real-estate-brokerage services, as defendants intended.

97.    Defendants' conspiracy had the following adverse effects:

a.  It restrained, suppressed, and eliminated price competition for real-estate-brokerage services in the MLS Service Area;

b.  It raised, fixed, maintained, and stabilized at artificially high levels prices for real-estate-brokerage services in the MLS Service Area;

c.  It deprived free and open market competition to plaintiffs and the class members for the purchase of real-estate-brokerage services in the MLS Service Area; and

d.  Plaintiffs and the class members paid more than they otherwise would have paid for real-estate-brokerage services in the MLS Service Area.

98.    Defendants' conspiracy substantially affected trade or commerce in violation of the Sherman Act.

99.    As a direct and proximate result of defendants' illegal conduct, plaintiffs and the class members were injured by paying more for real-estate-brokerage services than they would have paid absent defendants' conspiracy.

## **PRAYER FOR RELIEF**

Plaintiffs request the following relief:

a.  That this Court determine this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and certify plaintiffs' proposed class;

b.  That this Court find that defendants' conspiracy violated the Sherman Act;

c.  This this Court enter an order awarding attorneys' fees and costs associated with investigating and prosecuting this action;

d.  That this Court enter an order awarding pre-judgment and post-judgment interest; and

e.  That this Court enter an order awarding treble damages for plaintiffs and the class members as well as all other relief that this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand trial by jury on their alleged claims.

Dated:  January 13, 2010

<div style="margin-left:40%">

**THURMOND  KIRCHNER  TIMBES  & YELVERTON, P.A.**

By:    */s/Jesse A. Kirchner*_____
       Jesse A. Kirchner (Federal ID No.8067)
       Matthew E. Yelverton (Federal ID No. 7966)
       15 Middle Atlantic Wharf, Suite 101
       Charleston, SC 29401
       Telephone:    (843) 937-8000
       Facsimile:    (843) 937-4200
       Email:        jkirchner@tktlawfirm.com
                     myelverton@tktlawfirm.com

       S. Randall Hood
       Chad McGowan
       **McGOWAN, HOOD & FELDER, LLC**
       1539 Healthcare Drive
       Rock Hill, SC  29732
       Telephone:    (803) 327-7800
       Facsimile:    (803) 328-5656
       Email:        rhood@mcgowanhood.com
                     cmcgowan@mcgowanhood.com

</div>

John G. Felder, Jr.
**McGOWAN, HOOD & FELDER, LLC**
1405 Calhoun St.
Columbia, SC 29201
Telephone:      (803) 779-0100
Facsimile:      (803) 256-0702
Email:           jfelder@mcgowanhood.com

Daniel R. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
700 W. St. Clair Avenue, Suite 204
Cleveland, OH 44113
Telephone:      (216) 622-1851
Facsimile:      (216) 241-8175
Email:           karon@gsk-law.com

Mark Reinhardt
Garrett D. Blanchfield
**REINHARDT WENDORF & BLANCHFIELD**
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:      (651) 287-2100
Facsimile:      (651) 287-2103
Email:           m.reinhardt@rwblawfirm.com
                 g.blanchfield@rwblawfirm.com

Grant A. Goodman
**GOODMAN LAW FIRM**
1390 W 9th St., Suite 410
Cleveland, OH 44113
Telephone:      (216) 928-9990
Facsimile:      (216) 357-2679
Email:           ggoodlaw@yahoo.com

*Attorneys for Plaintiffs and the putative class*