## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Thomas Boland, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) | Civil Action No. 3:09-1335 |
| Consolidated Multiple Listing Service, Inc.; Landmark Resources, LLC; The Mungo Company, Inc.; LDG, Inc. d/b/a RE/MAX Metro Associates; DTBCR Holdings, Inc. (f/k/a Bob Capes Realty, Inc.); Sandion, a Texas general partnership, d/b/a Coldwell Banker United, Realtors; The Advantage Group, Inc.; Bollin Ligon Walker Realtors, P.A.; and Russell & Jeffcoat Realtors, Inc., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | **ORDER** |
| Albert Robertson and Frances Robertson, William J. Garrity, III, and Garrity Ventures, LLC, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 9:10-95 |
| Sea Pines Real Estate Companies, Inc. a/k/a The Sea Pines Real Estate Co.; Coastal Homes and Land, Inc. a/k/a Coastal Homes & Land Realty; Collins Group Realty, Inc.; Engard Rental Company, LLC a/k/a Engard Real Estate Co.; Bruce A. Goff, Inc.; Daufuskie Island Resort Realty, LLC; Searchlight Realty, Inc. a/k/a Searchlight Realty; Gateway Realty, LLC; Hilton Head Luxury Properties, Inc. a/k/a Prudential Premier Island Properties; Charter 1 Realty & Marketing; The William F. Hilton Company a/k/a William F. Hilton | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |



Realty; E.G. Robinson, III and Associates          )
Realtors, Inc. a/k/a E.G. Robinson Real            )
Estate; Gina Scott Realty; Lancaster Resort        )
Rentals and Sales, Inc. a/k/a Lancaster            )
Resort Sales; Ingram, Thompson & Assocs.,          )
Inc.; Julie Toon Pawley Real Estate Broker,        )
Inc.; and CRG Properties, Inc. a/k/a Carolina      )
Realty Group, Inc.,                                )
                                                   )
                    Defendants.                    )
_____           )

This matter is before the Court upon certain of the Defendants' motions to dismiss and to strike in the above-captioned cases. The Court held a hearing on these motions, following which the parties filed supplemental materials. The Court took the matter under advisement and now issues this order denying in part and granting in part the motions in both cases.[1]

## BACKGROUND

At issue in these putative class actions are certain rules and practices of the Columbia Multiple Listing Service ("CMLS") and Hilton Head Multiple Listing Service ("HHMLS"), which the Plaintiffs allege unfairly restrain competition and violate the Sherman Antitrust Act, 15 U.S.C. §§ 1-7. Specifically, in Civil Action number 3:09-1335 ("the Boland case" or "the Columbia case"), Plaintiff Boland, on behalf of himself and a class of certain purchasers of real estate, has sued the CMLS, as well as the various real estate brokerage firms with members who sit on the CMLS Board of Directors, alleging that the Defendants have conspired to unlawfully restrain competition among real estate brokerages by

---

[1] The Court regrets the delay in filing this order, but the complicated legal issues involved herein, coupled with the recent opinions of the United States Supreme Court, have given this Court much concern about the status of the law on these issues.



enacting and enforcing unlawful MLS rules, thereby excluding innovative brokerages and causing the Plaintiff to pay higher prices for real estate services. Similarly, in Civil Action number 9:10-95 ("the Robertson case" or "the Hilton Head case"), Plaintiffs Albert and Frances Robertson, on behalf of themselves and a class of certain purchasers of real estate, have sued the various real estate brokerage firms with members who sit on the HHMLS Board of Directors, also alleging that the Defendants have unlawfully restrained competition causing them to pay higher prices for real estate services.[2]

In the Boland case, Defendants DTBCR Holdings, Inc., Sandion, and Russell & Jeffcoat Realtors, Inc. ("the moving Defendants") filed a motion to dismiss and to strike, raising the following arguments: (1) the Plaintiff's claim is barred by the intraenterprise conspiracy doctrine because the CMLS and its board of directors is a single entity incapable of forming a conspiracy, Copperweld v. Independence Tube Corp., 467 U.S. 752 (1984); (2) the complaint does not contain sufficient factual content pursuant to Bell Atlantic v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), to state a "plausible" claim for relief; (3) the complaint fails because the alleged conduct is just as consistent with lawful business conduct, if not more so, than with an illegal conspiracy; (4) the complaint fails to properly allege anti-competitive effects; and finally (5) the Court should strike all of the Plaintiff's allegations regarding equitable tolling and fraudulent concealment.

In the Robertson case, all of the Defendants joined in the motion to dismiss and to strike, raising several of the same arguments raised in the Boland case, including: (1) the

---

[2] Interestingly, although the CMLS is a Defendant in Boland, the Plaintiffs did not name the HHMLS as a Defendant in Robertson.



3

Plaintiffs' complaint is barred by the intraenterprise conspiracy doctrine because the complaint fails to allege a conspiracy between two or more separate entities, Copperweld 467 U.S. 752; (2) the Court should strike all allegations in the complaint concerning United States v. MLS of Hilton Head, Inc., Civil Action No. 9:07-cv-3455, because that case was resolved by a consent decree without any adjudication of any fact or law; and finally (3) the Court should strike all of the Plaintiffs' allegations regarding equitable tolling and fraudulent concealment.

## ANALYSIS

### I.    Whether the Intraenterprise Conspiracy Doctrine Bars the Plaintiffs' Claims

Section 1 of the Sherman Act forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. "To establish a violation of § 1 of the Sherman Act, [a plaintiff] must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002) (citing Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 702 (4th Cir. 1991) (en banc)).

The initial question before the Court in these cases is whether the Defendants are even capable of engaging in a "contract, combination . . . , or conspiracy" as defined by section 1, or whether the Defendants' complained-of activity "must be viewed as that of a single enterprise for purposes of [section] 1." Copperweld, 467 U.S. at 771. As the Supreme Court has instructed: "concerted action under [section] 1 does not turn simply on whether the parties involved are legally distinct entities." American Needle, Inc. v. National Football League, et al., 130 S.Ct. 2201, 2209 (2010). Instead, "such formalistic



4

distinctions" should be eschewed "in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." Id.

In Copperweld, the Supreme Court examined the intraenterprise conspiracy doctrine and held that a parent corporation was legally incapable of conspiring with its wholly owned subsidiary for purposes of section 1. 467 U.S. at 777. In so holding, the Court explained that "[a]lthough a parent corporation and its wholly owned subsidiary are 'separate' for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they control a single aggregation of economic power." Am. Needle, 130 S.Ct. at 2211.

> As Copperweld exemplifies, "substance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1." 467 U.S. at 773, n. 21, 104 S.Ct. 2731. This inquiry is sometimes described as asking whether the alleged conspirators are a single entity. That is perhaps a misdescription, however, because the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved "seem" like one firm or multiple firms in any metaphysical sense. **The key is whether the alleged "contract, combination . . . , or conspiracy" is concerted action–that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a "contract, combination . . . , or conspiracy" amongst separate economic actors pursuing separate economic interests,"** id. at 769, 104 S.Ct. 2731, **such that the agreement "deprives the marketplace of independent centers of decisionmaking,"** ibid., **and therefore of "diversity of entrepreneurial interests,"** Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 57 ([1st Cir.] 2002 (Boudin, C.J.), **and thus of actual or potential competition**, see Freeman v. San Diego Assn. of Realtors, 322 F.3d 1133, 1148-[ ]49 ([9th Cir.] 2003) (Kozinski, J.); Rothery Storage & Van Co. v. Atlas Van Lines, Inc. 792 F.2d 210, 214-[ ]15 ([D.C. Cir.] 1986) (Bork, J.); see also Areeda & Hovenkamp ¶ 1462b, at 193-[ ]94 (noting that the "central evil addressed by Sherman Act § 1 is" the "elimin[ation of] competition that would otherwise exist").

Id. at 2211-12 (emphasis added). Thus, the question is whether the alleged conspiracy joins "independent centers of decisionmaking," Copperweld, 467 U.S. at 769, and, "[i]f it



5

does, the entities are capable of conspiring under § 1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one." Am. Needle, 130 S.Ct. at 2212.

Here, after careful consideration of the parties' competing arguments, the Court finds that the alleged conspiracy joins independent centers of decisionmaking that are capable of conspiring under section 1. Stated simply, although the CMLS and the HHMLS are themselves single entities, their boards are made up of independent brokerages who govern themselves and are economically separate from each MLS, and the independent brokerages have economic interests that are entirely distinct from those of each MLS.[3] Moreover, the brokerages who make up the MLS boards directly compete for business both with each other and with non-MLS brokerages. Were the Defendant board member brokerages always acting solely on behalf of the CMLS or the HHMLS–without any distinct economic interests of their own–then perhaps the intraenterprise conspiracy doctrine would apply. However, that does not appear to be the competitive reality. Here, without the CMLS or the HHMLS, each brokerage would decide individually how to operate and whether, when, how, and with whom to share its real estate listing information. With the CMLS and the HHMLS, however, the brokerages collectively make these decisions, which appears to be precisely "the joining of independent centers of decisionmaking" that deprives the market of potential competition, as contemplated by Copperweld and American Needle.

---

[3]    For example, although a multiple listing service profits by selling new memberships to additional brokerages, the board members' individual brokerages would seem to benefit from limiting entry to the multiple listing service.



Moreover, as the Supreme Court stated in American Needle, "[t]he justification for cooperation is not relevant to whether that cooperation is concerted or independent action." 130 S.Ct. at 2214. Thus, although the Defendants assert that the MLS is essential for the brokerages to function effectively, "[a] 'contract, combination . . . , or conspiracy,' [ ] that is necessary or useful to a joint venture is still a 'contract, combination . . . , or conspiracy' if it 'deprives the marketplace of independent centers of decisionmaking.' " Id. (quoting Copperweld, 467 U.S. at 769). As more colorfully explained by the Court: "a nut and a bolt can only operate together, but an agreement between nut and bolt manufacturers is still subject to § 1 analysis." Id. "The mere fact that [real estate brokerages] operate jointly in some sense does not mean that they are immune." Id. Accordingly, the Court finds that–at least for purposes of the Defendants' Rule 12(b)(6) motions–the intraenterprise conspiracy doctrine does not bar the Plaintiffs' claims.

## II.   Whether the Plaintiffs Have Alleged Sufficient Factual Matter to State a Facially Plausible Claim[4]

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the United States Supreme Court has recently outlined, the pleading standard in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 129 S.Ct. at 1949

---

[4] Although the Defendants in Robertson did not raise exactly the same grounds for dismissal as the Defendants did in Boland, it seems that the Court's analysis of the arguments in Boland would apply equally to Robertson due to the similarity of the cases.



7

(quoting <u>Twombly</u>, 550 U.S. at 555).[5]    Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " <u>Id.</u> Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 556).  A plausible claim need not be a probable claim; however, the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>  "Facts that are 'merely consistent with a defendant's liability' fail to nudge claims 'across the line from conceivable to plausible.' " <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 256 (4th Cir. 2009) (quoting <u>Iqbal</u>, 129 S.Ct. at 1949-51).  In evaluating a Rule 12(b)(6) motion, courts accept as true all well-pleaded facts and construe these facts in the light most favorable to the plaintiff.

Without a doubt, the Court's decisions in <u>Twombly</u> and <u>Iqbal</u> have caused some confusion and uncertainty among the courts.[6]  Despite the confusion, <u>Twombly</u> "do[es] not

---

[5]  In examining an anti-trust complaint in <u>Twombly</u>, the Court rejected the following, familiar "no set of facts" language from <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46(1957): "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  The Court stated: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." <u>Twombly</u>, 550 U.S. at 563.

[6]  In <u>Anderson v. Sara Lee Corp.</u>, the Fourth Circuit Court of Appeals noted this uncertainty, stating: "In the wake of <u>Twombly</u>, courts and commentators have been grappling with the decision's meaning and reach." 508 F.3d 181, 188, n. 7 (citing <u>Iqbal v.</u>



require heightened fact pleading of specifics," and it appears that notice pleading remains the rule.[7]  Twombly, 550 U.S. 570.  That being said, however, a plaintiff cannot rely on conclusory allegations,[8] and he must allege sufficient facts to state a claim that is plausible on its face.[9] "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 129 S.Ct. at 1950.

---

Hasty, 490 F.3d 143, 155 (2d Cir. 2007)).

[7] In Boland, the Defendants assert that "Twombly does create heightened pleading standards under rule 8, especially for antitrust cases."  (Entry 31 at 8.)  This statement appears to be incorrect, however, as the Court specifically noted:

> In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished " 'by the process of amending the Federal Rules, and not by judicial interpretation.' "  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515, 122 S.Ct. 992, 152, L.Ed.2d 1 (2002) (quoting Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires.  Fed. R. Civ. P. 9(b)-(c).  Here, our concern is not that the allegations in the complaint were insufficiently "particular[ized], ibid.; rather, the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible.

Twombly, 550 U.S. at 569, n. 14.

[8] Of course, it would be almost impossible to allege a claim without at some point referring to or reciting the elements of that claim.  However, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, 129 S.Ct. at 1950.

[9] Nevertheless, the Court believes that a plaintiff should not be expected to plead evidentiary detail or facts that are particularly within a defendant's control; in other words, courts must be careful not to permit the "plausibility" component of Iqbal to invade the province of a jury because plausibility is not a standard of likely success on the merits.



In their motion to dismiss, the <u>Boland</u> Defendants assert that the complaint does not contain sufficient factual matter to state a facially plausible claim.  Specifically, the Defendants assert that, to allege a conspiracy in a post-<u>Twombly</u> world, Plaintiff Boland must plead the time of the alleged agreement, the place at which the agreement took place, the identities of all persons involved in the agreement, and the specific details of the agreement.  The Defendants state: "plaintiff alleges only that at various *unidentified* times during the period 2001 to 2007 the defendant brokerages, through *unidentified* employees who were serving on the CMLS board, enacted rules, by-laws and policies which allegedly adversely affected competition."  (<u>Boland</u> Entry 26-1 at 9 (emphasis in original).)  The Defendants also allege: "[I]f in fact there were meetings at which there were express agreements to exclude competitors or to stabilize prices (as opposed to agreements on how to manage CMLS), Plaintiff should be required to allege the dates, times, places, and participants in the conspiratorial meetings.  Failure to do so requires dismissal."  (<u>Boland</u> Entry 31 at 14.)

In response, the Plaintiff argues that <u>Twombly</u> did not create a heightened pleading standard and that his complaint sufficiently pleads a section 1 Sherman Act claim pursuant to <u>Twombly</u>, 550 U.S. 544.  The Plaintiff states:

> Plaintiff's [complaint] stands in stark contrast to the complaint in <u>Twombly</u>.
> The [complaint] is complete with allegations of agreements among and
> between defendants.  The [complaint] alleges that "[w]hile involved in and
> participating on (via its employees) CMLS's Board of Trustees during the
> class period, [each defendant] agrees with its co-defendant brokerages to
> develop, implement, enact, and facilitate the enforcement of unlawful CMLS
> Rules, regulations, by-laws, policies, and procedures."  The [complaint]
> further alleges "[i]n formulating and effectuating their conspiracy, defendants
> met to discuss excluding, and agreed to exclude, innovative real-estate
> brokerages from participating in CMLS and from gaining important access
> to the CMLS database, which agreement and exclusion allowed defendants

10



> to charge Plaintiff and the class members supra-competitive prices for real-
> estate brokerage services, as defendants intended."

(Boland Entry 30 at 10.)

In Twombly, the Court considered the question of "whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action." 550 U.S. at 548. Ultimately, the Court determined that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a section 1 conspiracy claim. Id. at 557. The Court stated:

> Without more, parallel conduct does not suggest conspiracy, and a
> conclusory allegation of agreement at some unidentified point does not
> supply facts adequate to show illegality. Hence, when allegations of parallel
> conduct are set out in order to make a § 1 claim, they must be placed in a
> context that raises a suggestion of a preceding agreement, not merely
> parallel conduct that could just as well be an independent action.

Id. at 556-57.

Here, in contrast to the alleged course of parallel conduct complained of in Twombly, the Plaintiffs allege that the members of the MLS boards colluded and agreed to adopt certain rules and regulations for the purpose of restraining competition.[10] Stated simply, the Plaintiffs in Boland and Robertson do not rest their section one claims on descriptions of parallel business conduct. Instead, the Plaintiffs allege that the Defendant board members actually met and reached agreements to adopt certain by-laws and

---

[10] Again, even though the Defendants in Robertson did not raise this argument in their motion to dismiss, the Court's analysis of this issue should apply equally to both the Boland case and the Robertson case.



11

regulations. That being said, however, the Plaintiffs do not allege any specific time or location for these meetings; nor do they allege which of the Defendants actually participated in these meetings. Instead, the Plaintiffs discuss the various rules and regulations adopted by the boards and the alleged purposes and effects of those rules. Although the complaints do not include specific dates and locations of the meetings, it is difficult to fathom how the Plaintiffs, without the benefit of discovery, could know such details, as those facts are particularly within the knowledge and control of the Defendants. Moreover, as the Court stated in Twombly:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

550 U.S. at 556.

One thing is certain: these cases present the Court with difficult and particularly close questions. Nevertheless, after consideration of the competing arguments, the Court believes that the Plaintiffs' complaints, which allege more than parallel conduct, contain sufficient factual content to plausibly suggest an agreement among the Defendants.

In addition to alleging that the complaint fails to allege sufficient facts to show an agreement, the Defendants in Boland also assert that the complaint fails to allege facts sufficient to show an anticompetitive effect or harm to the market. See Am. Needle, 130 S.Ct. At 2206 ("The question whether an arrangement is a contract, combination, or conspiracy, is different from and antecedent to the question whether it unreasonably restrains trade."). In short, the Defendants assert that the Plaintiff's four purported



12

anticompetitive effects are not supported by any facts and are not pleaded with the required amount of specificity.[11]

In response to this argument, the Plaintiff first claims that <u>Twombly</u> does not require him to prove at the pleading stage that the illegal agreement resulted in anticompetitive effects. Nevertheless, the Plaintiff also claims that even if <u>Twombly</u> does apply to the pleading of anticompetitive effects, the complaint contains sufficient factual matter to satisfy that standard. Specifically, the Plaintiff claims that the complaint adequately alleges that the Defendants' conspiracy restrained price competition, artificially and illegally stabilized prices, deterred innovation, and prevented free competition, among other things. Moreover, the Plaintiff asserts that concerted action to set prices (a horizontal price-fixing conspiracy) is <u>per se</u> illegal, rendering any simultaneous pro-competitive justifications irrelevant.

As previously mentioned, to establish a violation of section 1 of the Sherman Act, a plaintiff must show (1) a contract, combination, or conspiracy, (2) that imposed an

---

[11] In the second amended complaint in <u>Boland</u>, the Plaintiff alleges that the Defendants' conspiracy had the following adverse effects:

    a.     It restrained, suppressed, and eliminated price competition for real-estate- brokerage services in the CMLS Service Area;

    b.     It raised, fixed, maintained, and stabilized at artificially high levels prices for real-estate-brokerage services in the CMLS Service Area;

    c.     It deprived free and open market competition to Plaintiff and the class members for the purchase of real-estate-brokerage services in the CMLS Service Area; and

    d.     Defendants' conspiracy substantially affected trade or commerce in violation of the Sherman Act.

(<u>Boland</u> Entry 22 at 18-19.) In addition, the Plaintiff alleges that the Defendants' illegal conduct caused the Plaintiff to pay more for real-estate-brokerage services than he would have paid absent the alleged conspiracy. (<u>Id.</u>)



13

unreasonable restraint of trade.  In evaluating whether a restraint on competition is

unreasonable, courts use one of three methods, depending on the restraint alleged: "(1)

per se analysis for obviously anticompetitive restraints, (2) quick-look analysis, for those

with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose

net impact on competition is particularly difficult to determine."  Cont'l Airlines, Inc. v.

United Airlines, Inc., 277 F.3d 499, 508-09 (4th Cir. 2002).  "[T]he three methods are best

viewed as a continuum, on which the 'amount and range of information needed' to evaluate

a restraint varies depending on how 'highly suspicious' and how 'unique' the restraint is."

Id. at 509 (citations omitted).

Per se analysis "permits courts to make 'categorical judgments' that certain

practices, including price fixing, horizontal output restraints, and market-allocation

agreements, are illegal per se.  Id. (citing Northwest Wholesale Stationers, Inc. v. Pac.

Stationery & Printing Co., 472 U.S. 284, 289 (1985), and NCAA v. Bd. of Regents of Univ.

of Okla., 468 U.S. 85, 104 (1984)).  "At the other end of the spectrum, if the

reasonableness of a restraint cannot be determined without a thorough analysis of its net

effects on competition in the relevant market, courts must apply a full rule-of-reason

analysis.  Id. (citing Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 709 (4th Cir. 1991)).

> In the rule of reason analysis, "the reasonableness of the restraint is
> evaluated based on its impact on competition as a whole within the relevant
> market." Oksanen, 945 F.2d at 708.  This evaluation requires a showing of
> "anticompetitive effect" resulting from the agreement in restraint of trade.  To
> have an "anticompetitive effect," conduct "must harm the competitive *process*
> and thereby harm consumers." Microsoft, 253 F.3d at 58.  "Harm to one or
> many competitors will not suffice." Id.  "The [Sherman Act] directs itself not
> against conduct which is competitive, even severely so, but against conduct
> which unfairly tends to destroy competition itself." Id. (internal quotations
> omitted).



14

Dickson v. Microsoft Corp., 309 F.3d 193, 206 (4th Cir. 2002).

In support of their argument, the Defendants in Boland cite Keller v. Greater Augusta Assoc. of Realtors, — F. Supp. 2d —, 2011 WL 108726 (S. D. Ga. Jan. 12, 2011), where the district court granted the Defendant's motion to dismiss on the basis that the Plaintiff failed to allege antitrust injury under the rule of reason. In Keller, a licensed real estate agent sued the Greater Augusta Association of Realtors, alleging a claim pursuant to section 1 of the Sherman Act based on the implementation and enforcement of a rule that prohibited him from advertising through the MLS's website. The Court ultimately determined that the Plaintiff's allegations were insufficient to state a Sherman Act claim, noting: "The factual allegations in Plaintiff's complaint recount personal grievances about harm to his own business and not about the negative consequences to competition in the market." Id. at *5.

As an initial matter, the Court agrees with the Boland Defendants that to state a viable section 1 claim, a plaintiff must allege facts which, if proven true, would demonstrate that the alleged conspiracy is likely to result in anticompetitive effect. In other words, the Court believes that Twombly applies to the pleading of all elements of a cause of action, which here requires pleading sufficient facts to show (1) a contract, combination, or conspiracy, (2) that imposes an unreasonable restraint of trade.[12]  Having found that the Plaintiffs have at least alleged sufficient facts to plausibly suggest an agreement or conspiracy, the next question is whether the Plaintiffs have pleaded sufficient facts to show

---

[12]  Twombly addressed the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, and, finding that the plaintiff failed to allege a conspiracy, did not need to reach the next question of whether the complaint properly alleged an unreasonable restraint of trade or anticompetitive effect. 550 U.S. 544.



15

that the alleged conspiracy resulted in an unreasonable restraint of trade.

After a thorough consideration of the parties' arguments, the Court again acknowledges that these cases present extremely difficult and particularly close questions of law. In addition, the Court recognizes that antitrust litigation often involves unusually costly and protracted discovery. Nevertheless, at this stage, the Court believes that the scale tips in favor of the Plaintiffs.

Here, the Plaintiffs assert that they have alleged a per se illegal horizontal price-fixing conspiracy. While the Court is not convinced that the per se analysis is the most appropriate, in analyzing the issue under the so-called rule of reason—which presumptively applies to section 1 claims—the Court believes that the Plaintiffs have sufficiently alleged harm to the competitive process, which then caused harm to the consumer. In other words, although the Plaintiffs do not allege specific price-fixing numbers, they do allege, for instance, that the complained-of rules and regulations preclude brokerages from offering less than the full array of services, even when a consumer may prefer to purchase less than the full array of services. As another example, the Plaintiffs allege that the complained-of rules and regulations require that MLS member brokerages to use a standard, pre-approved contract that would not allow a brokerage to offer to a seller the option of avoiding paying a commission if the seller actually finds the buyer on his own. These alleged restraints affect both the competitive process and the consumer within the relevant market (which is alleged to be those seeking real-estate-brokerage services within each of the MLS service areas). Moreover, in contrast to the allegations in Keller, the Plaintiffs' allegations in the instant cases do allege negative consequences to competition in the market. Cf. 2011 WL 108726, *5. Based on the foregoing, the Court believes that

16



the Plaintiffs have pleaded sufficient facts to show that the alleged conspiracy resulted in an unreasonable restraint of trade. In short, the Court finds that the Plaintiffs have nudged their claims (albeit just barely) across the line from conceivable to plausible.[13]

## III.   Whether the Court Should Dismiss or Strike the Allegations in Both Complaints Regarding Equitable Tolling and Fraudulent Concealment

In both Boland and Robertson, the Defendants allege that the Court should dismiss or strike the Plaintiffs' allegations regarding equitable tolling and fraudulent concealment based on the Plaintiffs' failure to plead these allegations with the required level of specificity. See Fed. R. Civ. P. 9(b). Specifically, the Defendants note that the Plaintiffs must allege affirmative acts of concealment and that a mere failure to disclose does not suffice. See Pocahontas Supreme Coal v. Bethlehem Steel Corp., 828 F.2d 211 (4th Cir. 1987) (affirming the district court's rejection of Pocahontas's "vague allegations of fraudulent concealment"); Supermarket of Marlinton, Inc. v. Meadow Gold Diaries, Inc., 71 F.3d 119, 126 (4th Cir. 1995) (holding that Marlinton must provide evidence of affirmative acts of concealment to satisfy the first element of the fraudulent concealment test).

---

[13] In addition to contending that the Plaintiff's complaints do not satisfy Twombly, the Boland Defendants also contend that the complained-of conduct is just as consistent with lawful business conduct as with an illegal conspiracy, requiring dismissal of the complaints. The Court is not convinced. First, the Court recognizes that when alleged trade-restraining concerted action could be consistent with independent conduct or a legitimate business purpose, a plaintiff must offer proof that the action is not based on a legitimate business purpose *to defeat summary judgment*, but at this stage, the Court does not believe that the Plaintiff is saddled with such an obligation. Moreover, the Court notes that in these cases the Plaintiffs have alleged behavior on the part of the Defendants that plausibly goes against each Defendant's self-interest "in the absence of similar behavior by rivals." 7 Areeda & Hovenkamp § 1415a (2d ed. 2003). For instance, it would not be in each Defendant's self-interest to require a real estate purchaser to agree to terms and conditions that the purchaser does not otherwise desire (thereby potentially losing that consumer's business to a rival) unless all of the Defendants' rivals are doing and/or requiring the same thing.



17

In response, the Plaintiffs claim that they have adequately pleaded fraudulent concealment, including pleading acts of concealment such as meeting secretly, giving pretextual reasons for the costs of real estate services, and agreeing at meetings not do discuss their illegal scheme publicly.

The doctrine of fraudulent concealment "prevent[s] a defendant from concealing a fraud, or committing a fraud in a manner that it concealed itself until the defendant could plead the statute of limitations to protect it." Supermarket of Marlinton, Inc., 71 F.3d at 122 (citation and internal quotation marks omitted). Thus, in certain circumstances, the limitations may be tolled by the equitable concept of fraudulent concealment, which requires proof that "(1) the party pleading the statute fraudulently concealed facts which are the basis of a claim, and that (2) the claimant failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." Pocahontas, 828 F.2d at 218. In addition, under the heightened pleading requirements of rule 9 of the Federal Rules of Civil Procedure, a plaintiff must state all averments of fraud, including those pertaining to fraudulent concealment, with particularity. Id. at 219; see also Wood v. Carpenter, 101 U.S. 135, 143 (1879) ("Concealment by silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.").

Here, the Plaintiffs have alleged that the Defendants never told them that they were fixing the prices of real estate, and therefore, the Plaintiffs could not have suspected the violations until at the earliest when the Department of Justice filed its complaint in October of 2007. The Plaintiffs further allege that the Defendants used means and methods designed to avoid detection such as (1) meeting secretly, (2) giving pretextual reasons for costs of real estate, and (3) agreeing not to discuss publicly the nature of their



communications in furtherance of their illegal scheme.  (See Boland Entry 22 at ¶ 64; Robertson Entry 1 at ¶ 88.)

After consideration, the Court agrees with the Defendants that the Plaintiffs' allegations lack the particularity required by Rule 9 and, therefore, are legally insufficient to state a claim of fraudulent concealment.  The cases are clear that a plaintiff must allege affirmative acts of concealment or affirmative steps to mislead; here, the Court believes that the Plaintiffs' allegations amount to no more than a failure to admit to wrongdoing, which does not suffice.  Accordingly, the Court finds that dismissal of these allegations is appropriate and the Court grants the Defendants' motions on this issue.

## IV.    Whether the Court Should Strike the Allegations in Robertson Concerning the Consent Decree in *United States v. MLS of Hilton Head, Inc.*

In Robertson, the Defendants also ask the Court to strike all allegations regarding United States v. MLS of Hilton Head, Inc., Civil Action No. 9:07-cv-3455-SB, because these allegations concern a separate proceeding that resulted in a consent decree, which is not evidence and cannot have any preclusive effect in another action.

In response, the Plaintiffs assert that the Defendants have failed to show that these allegations prejudice them.  The Plaintiffs also assert that striking these allegations is a drastic remedy when steps can be taken to keep irrelevant evidence from the jury.

After consideration, the Court agrees with the Defendants that the allegations concerning the consent decree in United States v. MLS of Hilton Head, Inc., serve no real purpose in this complaint, that they are unfairly prejudicial, and that they should be stricken because the case resulted in a consent decree.  Accordingly, the Court grants this portion of the Defendants' motion in Robertson.



19

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendants' motion to dismiss and to strike in <u>Boland</u> (Entry 26 in Civil Action No. 3:09-1335) is denied in part and granted in part, as outlined in this order.

**IT IS FURTHER ORDERED** that the Defendants' motion to dismiss in <u>Robertson</u> (Entries 20 and 26 in Civil Action No. 9:10-95) is denied in part and granted in part, as outlined in this order.

Finally, in this order, the Court has acknowledged the difficulty and uncertainty it faced in answering the legal issues questions presented; thus, the Court believes that this order resolves legal questions as to which substantial ground for difference of opinion exists, particularly in light of certain recent Supreme Court decisions (e.g., <u>American Needle</u>, <u>Iqbal</u>, and <u>Twombly</u>), as well as the various (and sometimes conflicting) cases interpreting those decisions. There is no doubt, too, that the instant cases will involve lengthy and costly discovery and will present further difficult questions pertaining to the issue of class certification. In guarding against these very real concerns, which the Court has spent much time contemplating in recent months, the Court believes that an immediate appeal of this order will serve the interests of all of the parties involved, will promote fairness and efficiency (with respect to both time and money), and may materially advance the ultimate termination of this litigation. <u>See</u> 28 U.S.C. § 1292(b) ("When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order



20

may materially advance the ultimate termination of the litigation, he shall so state in the order."). In addition, further action shall be stayed in these cases should an application for an immediate appeal be made to the Fourth Circuit Court of Appeals within ten days after the entry of this order. See id.

      **AND IT IS SO ORDERED.**

Sol Blatt, Jr.
Senior United States District Judge

March **23**, 2011
Charleston, South Carolina

